## CROCKER v. BARTEAU et al., Appellants.

### Division Two, May 19, 1908.

1. **REFERENCE: By Agreement: Equity Matters.** Where the record shows that the cause was referred to the referee by the mutual agreement of all the parties to the suit, the court did not err in so referring it, whether it involved matters of equitable cognizance or not.

2. ——: **Partnership.** Where plaintiff's right for the amount sued for did not grow out of a partnership arrangement between him and the defendants, but out of a contract by which they were to pay him that sum as the purchase price for a sale to them of a part interest in the properties, the suit is not one in equity, and the court did not err in referring it to a referee. Nor is the plaintiff's right to sue at law any less because defendants agreed to pay plaintiff the purchase price as soon as that sum was realized out of the first net profits of the partnership business.

3. **NET PROFITS: Partnership: Mine.** The owner of a mining lease sold a half interest to the defendants for $2,500 cash, and $2,500 when a shaft "now in process of sinking shall have reached mineral sufficient to satisfy them that good pay mineral exists in said shaft, sufficient to justify the erection of a mill on such property, then a complete concentrating mill is to be erected by all parties hereto, and in addition to the above payments it is agreed that said" seller "shall be paid the further sum of $4,166.66 out of the first net profits to be taken out of the ground," and hereafter "all parties hereto shall bear equally all further expenses of sinking shaft and developing the property

as their interests may appear." The shaft was sunk, and the mill constructed, and the seller bore his partnership share of the expenses, and then sold his claim for $4,166.66 to plaintiff. *Held*, that, by the words "first net profits taken out of the ground" was not meant that defendants should first be reimbursed for moneys expended by them in developing the mine, sinking the shaft, purchasing and erecting the mill, purchasing and operating machinery and paying royalties, but the first net profits, after the mill became a productive enterprise; and as the books showed that the receipts for ore sold exceeded the current operative expenses and the expenses of repairs and betterments, plaintiff is entitled to recover.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs*, Judge.

AFFIRMED.

*McAntire & Scott* for appellants.

(1) The court erred in referring the case to the referee. Both the right and remedy arose by reason of the relation of the parties to each other at the time the contract was made, and that is held by our courts to be that of a partnership, and the suit should have been brought in a court of equity instead of one at law. Snyder v. Burnham, 77 Mo. 52; Plumber v. Frost, 81 Mo. 425; Brownlee v. Allen, 21 Mo. 125; Priest v. Choteau, 12 Mo. App. 252; Rankin v. Farley, 29 Mo. App. 587; Freeman v. Hemingway, 75 Mo. App. 611. (2) The words "net profits" or "first net profits" mean that which shall remain as the clear gain of any business venture after deducting the capital in the business, the expenses incurred by its conduct and the loss sustained in its prosecution. Park v. Grant Locomotive Co., 40 N. J. Eq. 167; McCluskey v. Klosterman, 20 Ore. 111; Rubber Co. v. Goodyear, 9 Wall. 804; Long v. Kee, 42 La. Ann. 907; Hunter v. Roberts, 83 Mich. 72; Wallace v. Beebe, 12 Allen (Mass.) 354; Fuller v. Miller, 105 Mass. 103; Carter v. Arnold, 134 Mo. 208; Maloney v. Love, 11 Col. App. 288; Railroad v. Railroad, 50 Vt.

287; Hentz v. Penn. Co., 134 Pa. St. 346; Scott v. Hartley, 126 Ind. 246. (3) ''First net profits'' cannot exist until profits have been made. Profits mean the gain which is made upon any business investment or venture when both payments and receipts are taken into account. When shown, as in this case, that the expenses far exceeded the receipts from the date of the contract to the date at which it was sought to hold that there were ''first net profits,'' first net profits could not exist. People v. San Francisco Savings Union, 72 Cal. 199; Scott v. Hartley, 126 Ind. 246; Hentz v. Penn Co., 134 Pa. 343; Toombs v. Mining Co., 15 Nev. 444; Welch v. Cannfield, 60 N. Y. 475. (4) As this contract was made on January 8, 1900, expenses to begin January 1, 1901, the defendants agreeing to pay their proportion of the previous weeks' expenses, it was certainly contemplated that the period of time at which expenses should be considered was from the time the parties agreed that it should begin, and it clearly appeared from the evidence that by taking the same into consideration no profits at all had arisen. Connoly v. Davidson, 15 Minn. 519; People v. San Francisco Savings Union, 72 Cal. 199; Mobile v. Railroad, 153 N. E. 486.

*B. F. Shipley, Gardner & Cameron* and *P. D. Decker* for respondent.

(1) This is a suit at law and not in equity, because it grows out of a contract made between individuals before the status of partnership arose, whereby defendants agreed to pay $4,166.66 as part of the purchase price for their interest in the mine. (2) Even if the relation of partners existed, the agreement as to the deferred payment was not a partnership but an individual transaction, the same as if one partner had loaned money to the firm and taken a partnership note for it, and therefore it can be enforced in a court of law. Willis v. Barron, 143 Mo. 450; Cinnamond v. Greenlee,

10 Mo. 582. (3) Even if this were a suit in equity, appellants cannot complain now, because the court had jurisdiction, and appellants did not object to the procedure, at any time or in any manner in the lower court. They agreed to submit the case to a referee, they asked declarations of law, and they can not now for the first time claim to be injured. R. S. 1899, sec. 864; Herman v. Larkin, 108 Mo. App. 392; Benton Land Co. v. Zeitler, 182 Mo. 252; Cowen v. Railroad, 48 Mo. 556. (4) The intention of the parties, at the time of making the contract, will be carried into effect, so far as the rules of language, and the rules of law will permit. 2 Parsons on Contracts, chap. 1, sec. 3; Field v. Leiter, 118 Ill. 21; Holmes v. Bemis, 124 Ill. 454. (5) In construing a contract there is no better way to arrive at the intention of the parties than the construction placed upon the contract by the parties themselves. By the last contract between Scott and Barteau and Bolen, Scott sold a further one-sixth interest in the mine to Barteau and Bolen, and fixed the meaning of first net profits in these words: "It is understood that by the conveyance of this interest, it will reduce the deferred payment to be taken out of the ground in former contract, the ratio of one-sixth less." This expression of the parties is inconsistent with defendants' theory— that defendants should be reimbursed for all moneys spent in building the mill and making permanent improvements before the purchase price for the interest in the mine should become due. Where contracts are written in such a way as to be of doubtful meaning the construction given by the parties will be adopted by the courts. Laing v. Holmes, 93 Mo. App. 233. (6) If the current receipts exceed the current expenses of a business, it is apprehended the excess can be divided as profits; although the capital may be spent, or not be represented by salable assets. George on Partnership, pp. 81 and 184; 1 Bates on Partnership, sec. 229; Braun's

Appeal, 105 Pa. St. 414; Meserve v. Andrews, 106 Mass.
419. In estimating the profits of the business of a co-
partnership, it is error to include among the expendi-
tures such amounts as have been expended in perma-
nent improvements to the real estate—such improve-
ments must be regarded as capital. Braun's Appeal,
105 Pa. St. 414; Meserve v. Andrews, 106 Mass. 419. As
to the mode of ascertaining profits, where an individual
not a partner is entitled to a portion of the profits, the
usual method is to take the excess of current
receipts over current expenses. Lindley on Partner-
ship, p. 394; Rishton v. Grizelle, 5 Eq. 326, 10 Eq. 398;
Ins. Co. v. Van Cleave, 191 Ill. 410. Profits are excess
of receipts over expenses. Keaton v. Mayo, 21 Ga. 649;
Livingston v. Blanchard, 130 Mass. 341; Ins. Co. v. Van
Cleave, 191 Ill. 410; Fuller v. Miller, 105 Mass. 103;
Welsh v. Canfield, 60 Md. 469. As to the construction
of clauses of contracts with reference to the payments
of dividends out of profits, the courts have uniformly
held that where the current ordinary receipts exceed
the current ordinary expenses, the excess may be di-
vided as profits. Davisson v. Gillies, 16 Chan. D. 347n;
Bent v. Lon. Tram. Co., Id. 344; Bloxam v. Railroad, 3
Chan. 337; Flitchaft's Case, 21 Chan. 519. Interest on
capital can not be deducted before declaring dividends
of profits, in the absence of a contract to that effect.
5 Eq. Ca. 329; 10 Eq. Ca. 438; Paine v. Howell, 90 N.
Y. App. 660; Sanfield v. Barney, 4 N. Y. Supp. 500. De-
preciation of buildings in which a business is carried
on, though they were erected by the expenditure of capi-
tal invested, is not ordinarily or necessarily consid-
ered in estimating profits. Eyster v. Cen. Bd. Fin., 94
U. S. 500; Park v. Grant Locomotive Works, 3 Atl. 166.
The profits of a company are not such as remain after
the payment of every debt, but are the excess of ordi-
nary receipts over ordinary expenses, properly charge-
able to revenue account. Mills v. North R. Co., L. R. 5

Chan. 631; Birsch v. Cropper, 14 App. Ca. 525. Net profits are the excess of ordinary current receipts over ordinary current expenses. The expenses are limited to what is necessary to keep the capital intact. Park v. Tenille, 20 Ga. 118; Fuller v. Miller, 105 Mass. 103; Wallace v. Beebe, 12 Allen (Mass.) 354; Connelly v. Davidson, 15 Minn. 519; Jones v. Davidson, 2 Sneed (Tenn.) 452. A person not a partner, in any business, who is to receive or be paid a certain sum out of the first net profits, has a right to expect that the owner of the business will provide the necessary capital. The owner under these conditions can not deduct capital, or interest on capital, in the absence of a specific contract authorizing it. Braun's Appeal, 105 Pa. St. 414; Ins. Co. v. Van Cleave, 191 Ill. 410; Meserve v. Andrews, 106 Mass. 419; Whitcomb v. Converse, 119 Mass. 38; Fletcher v. Hawkins, 1 R. I. 330; Parnell v. Robinson, 58 Ga. 26; Taylor v. Davis, 110 U. S. 330; Sheldon v. Purdy, 17 Wash. 135; State v. Marion Co., 21 Kan. 434; Eyster v. Cen. Bd. Fin., 94 U. S. 500; 8 Am. and Eng. Ency. Law, 504; 90 N. Y. App. 660; 4 N. Y. Supp. 500. Where the contract imposes a liability on the business and the partners, or stockholders, to be paid out of the first net profits of the business or venture, the partners or stockholders do not receive all the money they have put into the business of the venture, before the liability is discharged. It must be paid out of the excess of current receipts over current expenditures. Eyster v. Cen. Bd. Fin., 94 U. S. 500; Taylor v. Davis, 110 U. S. 330; Ins. Co. v. Van Cleave, 191 Ill. 410.

GANTT, J.—This is an action by attachment brought by the plaintiff against the defendants in the circuit court of Jasper county for $4,166.66, together with interest thereon from November 2nd, 1901. The ground of the attachment was that the defendants were non-residents of the State of Missouri, and were about fraudulently to convey and assign their property and

effects so as to hinder and delay their creditors and have fraudulently conveyed and assigned their property and effects so as to hinder and delay their creditors. The answer of the defendants was to the merits and they admitted the execution and delivery of the contracts pleaded in plaintiff's petition and denied each and every other allegation contained in the petition.

The petition in substance states that the defendants were partners at all the times hereinafter mentioned and engaged in mining for lead and zinc ores in Jasper county, Missouri; that on or about January 8th, 1900, Adam Scott was the owner of a certain mining lease and machinery on lots No. 9, 10, 17 and 18 on the land of the Chitwood Hollow Mining Company, which lease bore date July 12th, 1899, and ran for a period of ten years from said date and was known as the "Great Scott" mine. That on or about January 8th, 1900, said Scott executed and delivered to defendants A. B. Barteau and A. O. Bolen a certain contract of sale of said mine and lease in words and figures as follows:

"Joplin, Mo., January 8th, 1900.

"I, Adam Scott, hereby sell and assign to A. B. Barteau and A. O. Bolen who are hereby designated as parties of the second part an undivided one-half interest in a certain lease from Chitwood Hollow Mining Company, to Adam Scott bearing date of July 12th, 1899, and running for a period of ten years from date; said lease covering lots Nos. 9, 10, 17 and 18; also an undivided one-half interest in all fixtures, viz., one Sullivan steam drill, pipes and fittings, one twenty-five H. P. boiler except one hundred dollars payment to Leedy & Co., all tools, rope, tubs, cars, derricks, lumber, etc.,with large cage shaft down to about eighty feet for and in consideration of $2,500 in hand paid the receipt whereof is hereby acknowledged and the further conditions and stipulations hereinafter contained, viz., that said second parties are to pay me the

further sum of $2,500 when said shaft now in process of sinking shall have reached mineral sufficient to satisfy them that good pay mineral exists in said shaft sufficient to justify the erection of a mill on said property then a complete concentrating mill is to be erected by all parties hereto and in addition to the two above payments made, it is agreed by and between the parties hereto that said Adam Scott shall be paid the further sum of $5,000 out of the first net profits of the mine, as full and complete consideration. Commencing January 1st, 1900, all parties hereto shall bear equal all the further expenses of sinking shaft and developing the property as their interests may appear.

"It is further agreed by and between the parties hereto that if said second parties do not make the further payment of $2,500 as above set out in second payment, then any and all payments previously made shall be held as liquidated damages and said second parties shall reassign back to said Adam Scott all their right, etc., title and interest, in the above described property as herein conveyed.

"In witness whereof we have hereunto set our hands and seals as of the date first above mentioned.

"Seal.   ADAM SCOTT.
"Seal.   A. B. BARTEAU.
"Seal.   A. O. BOLEN."

That said contract of sale was duly recorded in Jasper county, January 17th, 1900; that by the terms of said contract said Barteau and Bolen acquired an undivided one-half interest in said mine and lease, and by the terms of said contract it was agreed and understood that when the shaft of said mine then in the process of sinking should reach mineral sufficient to satisfy the parties of the contract that pay mineral existed in quantities sufficient to justify the erection of a mill on said property, then a complete concentrating mill should be erected by all parties to the contract, and that

commencing January 1st, 1900, should bear equally all
the expenses of sinking the shaft and developing the
property. And by said contract it was further agreed
that the said Adam Scott was to receive the sum of
$5,000 out of the first net profits of said mine. Plaintiff
avers that said shaft thus in process of sinking reached
pay ore sufficient to satisfy the parties to the contract
that they were justified in erecting a concentrating mill
and that said Adam Scott paid his part of the expenses
of sinking said shaft and building the mill and develop-
ing the property and performed all of his covenants and
agreements as set forth in the said contract. That on
or about February 6th, 1900, said Adam Scott executed
and delivered another contract of sale conveying to said
Barteau and Bolen a further one-sixth interest in said
mine and lease which said contract of sale was in words
and figures as follows:

"Joplin, Mo., February 6th, 1900.
"I, Adam Scott, hereby sell and assign to A. B.
Barteau and A. O. Bolen who are hereby designated as
parties of the second part an undivided one-sixth in-
terest in a certain lease from Chitwood Hollow Mining
Company to Adam Scott bearing date of July 12th,
1899, and running for a period of ten years from date;
said lease covering lots Nos. 9, 10, 17 and 18; also an
undivided one-sixth interest in all fixtures, viz.: One
Sullivan steam drill, pipes and fittings, one twenty-five
H. P. boiler, one steam hoister, all tools, ropes, tubs,
cars, derricks, lumber, etc., with a large cage shaft
down about one hundred feet, for and in consideration
of $5,000 cash in hand paid, the receipt whereof is here-
by acknowledged, and the further conditions and stipu-
lations hereinafter contained, viz., that said second
parties are to pay me the further sum of $2,000 when
said shaft now in process of sinking shall have reached
mineral sufficient to satisfy them that good pay mineral
exists in said shaft sufficient to justify the erection of.

a mill on said property. Then a complete concentrating mill is to be erected by all parties hereto. Commencing February 12th, 1900, all parties hereto shall bear equal all the further expenses of sinking shaft and developing the property as their interests may appear. And it is further agreed by and between the parties hereto that if said second parties do not make further payment of $2,000 as above set out in second payment, then any and all payments made shall be held as liquidated damages, and said second parties shall re-assign back to said Adam Scott all their right, etc., title and interest in the above described property herein conveyed. It is understood that by the conveyance of this interest that it will reduce the deferred payment to be taken out of the ground in former contract the ratio of one-sixth.

"In witness whereof we have hereunto set our hands and seals the date first above mentioned.

"Seal.   ADAM SCOTT.
"Seal.   A. B. BARTEAU.
"Seal.   A. O. BOLEN."

Which said additional contract of sale was also duly recorded. That by said last-mentioned contract of sale said Barteau and Bolen acquired a further one-sixth interest in said mine and lease and said Scott reduced the amount of the aforesaid deferred payment of $5,000 to be paid him out of the first net profits of said mine by one-sixth, leaving a balance to be paid said Scott out of the first net profits of said mine $4,166.66; that according to said contract it was agreed that when a certain shaft then in process of sinking should reach mineral sufficient to satisfy the parties to the said contract they would be justified in erecting a mill then a complete concentrating mill should be erected by all the parties to said contract, and that all parties to the contract were to bear equally their part of the expense in sinking the shaft and developing the property. That

mineral was reached in said shaft sufficient to satisfy the parties that they were justified in erecting said mill and a concentrating mill was erected and said Scott paid all of his part of the expenses of sinking said shaft, erecting the mill and developing the property and performed all of his covenants and agreements set out in said contract. That on September 5th, 1900, for value received said Adam Scott sold, transferred and assigned to plaintiff all of his right, title and interest in and to the first net profits of said mine in the sum of $4,166.66 as aforesaid. That thereafter on November 1st, 1900, said Adam Scott sold and transferred to defendant L. A. Saighman his remaining one-third interest in said mine and lease subject to the payment to plaintiff of said sum of $4,166.66 out of the first net profits of said mine and said Saighman then and there agreed that plaintiff should have said sum of $4,166.66 out of the first net profits of said mine as aforesaid, and said payment to plaintiff of said first net profits was part of the consideration of said sale by said Scott to her, the said L. A. Saighman. The said D. E. Saighman claims some interest in said mine and lease by or through said L. A. Saighman, or as trustee or agent for her, the nature and extent of which are to plaintiff unknown. That thereafter, on or about April 1st, 1901, to about November 1st, 1901, net profits were made out of the mineral produced from said mine and lease exceeding the sum of $4,166.66 and defendants have failed and refused to pay the same to plaintiff, although often requested to do so, and have converted the same to their own use. Wherefore plaintiff prays judgment against defendants for $4,166.66 and legal interest thereon from said time that said net profits were realized, together with costs of this suit.

At the May term, 1904, by agreement of all parties to the case, the cause was referred by the court to A. C.

Burnett, Esquire, as referee to take the testimony in the cause and report his findings on the same to the court. At the October term, 1904, the referee filed his report, wherein he found the execution of the two contracts heretofore set out in the statement of the cause and in the petition, and also the assignment to the plaintiff Crocker of the $4,166.66, which according to the contract was to be paid Scott by the defendants Barteau and Bolen out of "the first net profits of the mine." He also found that on November 1st, 1900, said Scott sold his remaining one-third interest in said mine, lease and machinery to Mrs. L. A. Saighman. He further found from the evidence that Scott and defendants Barteau and Bolen sunk the shaft on the mining lots until sufficient mineral was reached to satisfy them that good pay mineral existed and then said Scott, Barteau and Bolen erected a concentrating mill. Referee also found that said Scott kept and performed all the conditions of the said two contracts on his part. The referee found that the cost from January 1st, 1900, to March 19th, 1901, of building the mill, sinking the shaft and developing the mine so that it would produce ore amounted to $22,157.20, and found that the current expenses of operating the mine from March 20th, 1901, to November 2d, 1901, inclusive, amounted to $16,650.53, and that the defendants received from the sale of ore from said mine from March 30th, 1901, to November 2nd, 1901, inclusive, after paying the royalty thereon, the sum of $24,324.79, and that there was a net profit from said mine from March 20th, 1901, to November 2nd, 1901, inclusive, of $7,674.26. He also found by the contracts in evidence, the said Scott and the defendants were each to bear the expenses of sinking the shaft and developing the property and building the mill, in proportion to the interest of each, and that each party had paid his part of the said expenses, and that out of the first net proceeds of the sale of the ore

from March 20th, 1901, to November 2nd, 1901, the first net profits of the mine were as already stated $7,674.26, and that plaintiff as the assignee of the $4,166.66 was entitled to recover that sum with interest from November 2nd, 1901.

There was a motion by the defendants to set aside the report of the referee on various grounds and the court set it aside in so far as the referee reported his conclusion of the law, on the ground that the law of the case was not referred to the referee, but in all other respects the report of the referee was sustained and the court rendered judgment for the plaintiff for $4,975.65. In due time the defendants filed their motion for a new trial, which was heard and overruled by the court and thereupon the defendants appealed to this court in due form.

* I. The first contention of the defendants is that the court erred in referring this cause to a referee, on the ground that Scott and the defendants were co-partners and the suit should have been brought in a court of equity instead of an action at law. We think there is little merit in this proposition for two reasons: First, the record shows that the cause was referred to the referee by the mutual agreement of all parties to the suit, and, second, for the reason that Scott's right to the payment of the $4,166.66 did not grow out of the partnership arrangement between these parties, but out of the contract between them by which the defendants were to pay Scott that sum as part payment for a two-thirds interest in his lease. This liability on the part of the defendants to Scott and the plaintiff as his assignee is not different in law from what their relation would have been if defendants had given Scott their note for that amount in payment to him for the interest which they acquired in his lease with the view to a subsequent partnership in the development and operation of said mine; it was not a firm transaction to be settled

upon an accounting in equity. [Willis v. Barron, 143 Mo. 450.] In Cinnamond v. Greenlee, 10 Mo. 1. c. 582, this court said: "One partner would be a competent witness by whom to prove that a second partner had advanced money for a third, as part of his portion of the capital stock of the partnership concern; and such second partner would have a right at law to recover the amount thus advanced for the third partner, even during the existence of the partnership. Such transaction does not enter into and form a part of the partnership business, so as to require the interposition of a court of equity to adjust and settle the rights of the several partners." Nor is the right of the plaintiff to sue at law any the less because the defendants agreed to pay Scott the $4,166.66 as soon as that sum was realized out of the first net profits of the mine. Moreover, it is sufficient to say on this point that no such proposition was mooted in the circuit court, as the defendants filed a general denial, agreed to submit the case to a referee, and requested the court to give declarations of law, and in every way treated the case as an action at law and not a suit in equity and the cause was submitted to the court without the intervention of a jury, and the judge had all the evidence before him when he rendered his judgment for the plaintiff.

II. A number of declarations of law were prayed by plaintiff and the defendants, but in the view we take of the case, it is unnecessary to discuss them in detail, for the reason that the sum of the declarations given in behalf of the plaintiff was simply to the effect that if the current receipts of the said mining venture between March 20th, 1901, the time when the mill began to be operated, and November 2nd, 1901, exceeded the current expenses of operating said mine then *first net profits existed,* and the plaintiff was entitled to receive the $4,166.66 and interest thereon from November 2nd, 1901, if said net profits amounted to that much, or was

in excess thereof. On the other hand, the declarations of law advanced by the defendants were to the effect that the defendants should be reimbursed for all moneys expended by them in the development of the mine and sinking of the shaft, the erection of the mill and the putting in of the machinery for the operation of the mine, as well as the current expenses of operating the mine and mill and the payment of royalties, and unless there was an excess of receipts over all the above expenditures, then there were *no first net profits,* and plaintiff could not recover. There is in fact little dispute about the facts in this case. The referee found that the cost of building the mill and buying the machinery and sinking the shaft prior to March 20th, 1901, the date when the mill began to be operated, amounted to $22,157.20 and the circuit court affirmed this finding and the evidence tends to fully support it; indeed, it seems not to be questioned by the defendants. On the other hand, the referee found that from March 20th, 1901, the time when the mill began to be operated and the ores to be marketed, to November 2nd, 1901, the current expenses including repairs and betterments were less than the current receipts by $7,674.26, and these facts appeared from the books kept by the company. So that, with these figures as a basis, the question recurs, after all, to the proper construction of the two contracts between Scott and the defendants and how the first net profits under said contracts are to be estimated. If the declaration of law asked by the defendants and refused by the court to the effect that defendants should first be reimbursed for moneys expended by them in the development of the mine and sinking of the shaft, in the purchase and erection of the mill, and the machinery for the operation of the mine and mill and the payment of the royalties before taking into account any of the profits of said enterprise, is correct, then plaintiff is not entitled to recover. But if a

fair construction of these contracts in view of the circumstances surrounding the parties at the time they were made shall lead to the conclusion that by *first net profits* the parties intended the *first net profits* which accrued after the mine became a productive enterprise, that is to say, when the current receipts from the sale of ores taken from the mines exceeded the current expenses for operating the mine, including repairs and betterments, then to the amount of such excess of profits there would be net profits, then clearly plaintiff is entitled to recover, as the evidence shows that from March 30th, 1901, to November 2nd, 1901, inclusive, there was an excess of receipts over and above current expenses for that time of $7,674.26, or more than enough to pay the agreed sum of $4,166.66 on November 2nd, 1901.

In construing the words "first net profits," in the first contract, the words used in the second contract must be read in connection therewith, to-wit, "it is understood that by the conveyance of this interest it will reduce the deferred payment *to be taken out of the ground,* in former contract, the ratio of one-sixth." At the outset it is essential to keep in view that the $4,166.66 was a deferred payment to be made to Scott as a partial payment for the interest he thereby sold to defendants; in other words, was a part of the purchase money for said interest, and as to that the words "net profits" ought not to be construed as in the case of dividends to be distributed to stockholders in which interest on bonded indebtedness is accounted as a part of the liabilities or current expenses before dividends are payable. [St. John v. Railroad, 10 Blatchf. 279, 22 Wall. 136.] Nor yet upon the basis of a final adjustment between plaintiff and defendants upon the final settlement of the venture upon the whole lease, but rather upon the principle announced as to the proper mode of ascertaining profits where an individual not a

partner is entitled to a portion of the profits. It is significant that the contracts not only secure to plaintiff a payment of the $4,166.66 out of the "net profits," but the "*first* net profits" "to be taken out of the ground." Bearing in mind that plaintiff had his share in the mine and defendants theirs, this was capital and each contributed his pro rata share in purchasing machinery, a concentrating mill, etc., in order to make it a producing enterprise; all this was capital. Now, notwithstanding this mine might have become vastly more valuable than it had cost plaintiff and defendant, plaintiff could not have demanded the $4,166.66 out of this increase in the value of the capital invested, but was restricted by his agreement to await the earning of "net profits" "out of the ground." We think this capital was not to be reimbursed to the parties before an account of "first net profits" was to be estimated. The contracts of defendants imposed a liability upon the mining project and it was to be paid out of the *first* excess of current receipts for ore taken out of the ground over and above the current expenses for producing said ore and the necessary charges for repairs and betterments. As said by the Supreme Court of the United States, in Eyster v. Centennial Board of Finance, 94 U. S. 1. c. 503, "The capital stock of this corporation was not employed in, but to prepare for, the business of the contemplated exhibition, and the receipts of the exhibition, over and above its current expenses, are the profits of the business. These were the only profits of the business. They are, in fact, the net receipts, which, according to the common understanding, ordinarily represent the profits of a business. The public, when referring to the profits of the business of a merchant, rarely ever take into account the depreciation of the buildings in which the business is carried on, notwithstanding they may have been erected out of the capital invested. Pop-

ularly speaking, the net receipts of a business are its profits. So here, as the business to be carried on was that of an exhibition, and its profits were to be derived only from its receipts, to the popular mind the net receipts would represent the net profits."

This is not a case in which the parties contemplated the prosecution of this mining enterprise for the full term of their lease and to pay Adam Scott at the end of that time the deferred payment which defendants agreed to make him for their share in the lease and in which he must wait until the termination of the lease and until all liabilities had been paid and then to receive said $4,166.66 out of the remaining assets, if there were any "net profits." We think it is perfectly obvious that all parties to this agreement understood and agreed that out of the *first* net profits from ores taken out of the ground, Scott was to receive the balance of the purchase money due him and that by *first net profits* they meant the *first* profits arising from the receipts for ores over and above the current expenses in operating the mine, including current repairs and betterments, and it was never intended that defendants should be reimbursed for all their outlays in the way of capital before they should pay this deferred, and, we add, preferred, claim to net profits. To so hold would be to say that defendants could retain all the capital they had invested and require the plaintiff to wait until they had earned the full amount of their capital before paying the purchase money they had agreed to pay plaintiff. The contracts are not fairly susceptible of any such a construction. We have read the numerous authorities cited by counsel, but it would subserve no good purpose to review them at length and distinguish the various conclusions reached by the courts as to the meaning of the term "net profits" in the peculiar circumstances of each case. Many, and indeed most, of the cases are those growing out of partnerships or cases in

which the duty of declaring and paying dividends by corporations were in judgment, and while they adjudge what are and what are not net profits and the basis of ascertaining them, they throw little light upon contracts like the one upon which this action is based. The plaintiff in this case as the assignee of Scott did not bear the relation of partner or stockholder to these parties or the fund out of which he was to be paid the deferred payment. His right rests upon an express contract and we apprehend when the current receipts for ore exceeded the current expenses in running this mine to the extent of $4,166.66, he was entitled to recover that amount and was not concerned in the capital invested by defendants and Scott in the enterprise, whether it had been enhanced far beyond the original investment or whether it had depreciated. He was bound to look to the net profits to be taken from the ground, and so the circuit court held, and its judgment is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.