METROPOLITAN LIFE INS. CO., APPELLANT, v. PETE W. ERDWINS ET AL., RESPONDENTS.—83 S. W. (2d) 597.

Kansas City Court of Appeals. May 13, 1935.

438

*Leroy A. Lincoln* and *Montgomery, Martin & Montgomery* for appellant.

*Carl L. Ristine* and *Blackwell & Sherman* for respondent.

BLAND, J.—This is a suit instituted by a bill in equity asking the cancellation of a policy of life insurance, including total and permanent disability and accidental death coverage, issued by the plaintiff to the defendant, Pete W. Erdwins. Prior to the institution of the suit the insured suffered a total and permanent disability. Claim therefor was made and refused. Thereafter this suit was instituted.

The chancellor decreed the cancellation of that part of the policy covering insurance upon the life and for accidental death of the insured, refused to cancel and upheld as a valid and subsisting obligation the permanent and total disability coverage, and rendered judgment in favor of the defendant, Ruby Erdwins, in the sum of $780 for total disability of the insured for a period beginning on March 24, 1930, and ending June 24, 1933. Plaintiff has appealed, claiming that the court erred in failing to cancel the policy in its entirety. Defendants have not appealed.

The policy provided, among other things, that plaintiff would pay to Ruby Erdwins, the wife of the insured, $20 per month if the disability of the insured was due to or accompanied by mental incapacity. It was upon this clause of the policy that the court rendered judgment in favor of the defendant, Ruby Erdwins.

In the spring of 1930, insured suffered a nervous breakdown and in May or June of that year his ailment was diagnosed as dementia praecox. He entered the State Hospital for the Insane at St. Joseph on July 8, 1930, and remained there until September 24, 1930, on

which day he was paroled. He was returned to this institution on February 5, 1931 and has remained there ever since.

Defendant, B. M. Little, was appointed guardian *ad litem* to represent the insured in this suit. The defendant, Traders Bank, claimed an interest in the policy by virtue of an assignment thereof by the insured and the beneficiary to it as security for a certain indebtedness which he and his wife contracted to the bank while he was on parol from the hospital.

Plaintiff in its bill sought to have the policy cancelled on the ground of breach of warranty and fraud in the application and for procurement of the insurance by the insured. The application was dated May 15, 1929, and the policy was issued on May 22 of that year. In the application which insured signed he stated that his present condition of health was good; that he was last sick in February, 1920; that the nature of his ailment was influenza and that he was sick eighteen days; that he had no mental or physical infirmities; that he had not been attended by a physician for five years and had lost no time from his work during that period. The application disclosed that insured was twenty-seven years of age at his nearest birthday. It recited that insured had read the answers to the questions before signing it; that they were correctly written; that they were full, true and complete. The application also stated that it was understood and agreed that the statements and answers contained therein were correct and wholly true and formed the basis of the contract of insurance if one should be issued.

The evidence shows that insured lived with his wife and three children near Lexington; that in his youth he had suffered an attack of spinal meningitis which left one of his legs somewhat shriveled and slightly shorter than the other. Insured lived on a farm consisting of about 100 acres. He did all of the work of the farm except at harvest times. He was a very ambitious man and a hard worker.

Plaintiff called as a witness, Dr. Payne, of Lexington, who testified that he was insured's family physician; that he had treated insured in 1920; that the latter moved away and later returned and in 1926 the witness again became insured's family physician; that in 1926 most of his services were to insured's family; that starting about September, 1927, and continuing until December of that year he treated insured, seeing him anywhere from one to four times per week, both at his home and at the doctor's office in Lexington but mostly at the latter; that he treated insured at intervals through 1928 but not so often as he had in the fall of 1927.

The doctor further testified that in September, 1927, insured "just complained of being tired and weak, just a general debility, and he had a nerve tire, a physical tire. He was a man that was very ambitious, he worked hard and wasn't strong and he would get a

tire; just a general weakness. Q. Did you make any diagnosis of his condition at that time? A. Well, I didn't make a diagnosis in one sense; I knew his condition was one—just one of those asthenic conditions, or neurasthenia. Q. It was a nervous condition that was manifesting itself then? A. Yes" that during the fall of 1927 insured and one of his little girls became poisoned from milk; that insured expressed the opinion that someone had given his cows poison; that the treatment that the doctor gave him from September to December, 1927, was "general constructive treatment, both general reconstructive tonics and nerve tonics and nerve building and general builders;" that he gave insured some intravenous treatments two or three times a week and "then rested on it awhile, and then gave him some more a little later, in that time from September until December;" that he also prescribed some oral treatments which consisted of medicine that he gave insured to take at home three or four times a day. Asked as to the condition of insured's mind during that time the witness stated: "Well, with that one exception (evidently referring to insured's belief that his cows had been poisoned), which was of short duration, it was very good; he was a little blue, so to speak, he was a little depressed in that he didn't feel good; he liked to work and he liked to feel good and, of course, when he didn't that would make him a little depressed, but the only marked symptoms he had was a little at that time. . . . Q. From your familiarity with this case, from your treatment of Mr. Erdwins, I wish you would tell us what, if any, connection there is, or where there was, between Mr. Erdwins' condition in 1927 and the condition in which you found him in 1930? A. Well, as I know the case now, I can look back on the case, his condition at that time may be one that is similar to a condition that usually precedes the one that he has now. Q. You mean, Doctor, by that that the condition as it existed in 1927 was a forerunner of this condition that you found in 1930? A. Well, this condition that he now suffers usually follows just such a condition that a patient who is run down, weak, tired, nervous, are the ones that develop—may easily develop, dementia praecox."

On cross-examination the doctor testified that there would be intervals of a few weeks or a month that insured did not see the witness "from December, September, '27, through '28 and '29 he was very much improved and got along very good;" that insured had some symptoms of anemia; that the treatment he gave insured was a tonic, special foods, in order to build up the blood, which is deficient in red corpuscles in anemia; that insured reacted favorably to these treatments; that he was better in 1929 than he was in 1928; that after the first "three months in the year of 1928 he got along very nicely; however, I saw him all during the year. Q. You never

at any time suggested to Pete (insured) that he had any mental derangement or mental trouble, did you? A. No, sir.''

On re-direct examination he testified that insured during the period from September to December, 1927, was confined to his bed at times; that the witness did not go to see him at the house over three or four times; that insured was not in bed "over a period of time." On recross-examination he testified that he was not the regular examining physician for the plaintiff, "I was one of the examining physicians."

Later in the trial Dr. Payne was called for further cross-examination. He testified in regard to the statement of insured that he and his child had become sick by reason of poisoned milk from cows that someone had poisoned, as follows: Q. Doctor, as a medical man, you never attached any significance to that isolated instance as throwing any light upon any mental derangement, did you? A. Well, I knew that it wasn't right, but, of course, waited developments and there were no further developments as to any mental derangement, so I didn't think anything of it. Q. I say, you didn't attach any significance to that isolated one instance at all? A. No, I didn't. Q. In other words, before a medical man would attach any significance to the fact that anybody was having delusions or misapprehensions about a matter, they would have to occur a good many times before you would attach any medical significance to it, isn't that true? A. Yes, they would have to continue and be pronounced enough that you could make a diagnosis;'' that he had attended insured at the time the latter had a nervous breakdown in the spring of 1930; that that was the first time that the witness had attached any significance to insured's mental symptoms. "Q. Now, the fact that the man would get tired after working hard, or the fact that he had neurasthenia, the most that you could say about neurasthenia was that that might have been a forerunner to a mental breakdown; is that correct? A. Yes. Q. A great many patients who have neurasthenia never have any mental breakdown or any mental trouble at all? A. Yes, that is true."

On re-direct examination he testified as follows: "Q. Doctor, I believe that you just stated that at the time in 1927 when Mr. Erdwins was complaining about the milk and thought possibly someone had poisoned his cows, that you didn't attach any significance to that delusion? Q. That is correct, isn't it, Doctor? You stated you attached no significance to that? A. At least as a diagnosis of a mental disease; I attached significance to it, I thought of it, considered it, of course, but, as I say, it didn't develop and so far as being a part of a mental derangement at that time, why, it didn't continue long enough and I dismissed it. Q. Did you later make a diagnosis of mental trouble along in 1930 when the symptoms appeared acute? A. Yes. Q. At that time state whether or not you

placed any significance upon this incident we have just been discussing? A. I don't believe I quite understood. Q. I mean when you actually made the diagnosis of mental trouble did you take into consideration the past history of the case that you had? A. Well, I diagnosed in 1927 as neurasthenia and oftentimes those same symptoms and the symptoms of neurasthenia may be the forerunner or the advanced symptoms of some mental trouble. Q. State whether or not that was true in Erdwins' case; that is, that you determined that these symptoms you noticed in 1927 were, in fact, in your opinion, the forerunners of this mental condition that later developed? A. Well, they might have been. Q. And what is your opinion as to that, Doctor? A. Well, I don't know positively, I can't say positively that they were, but, as I stated the other day, as I looked back over the case, the initial symptoms of dementia praecox, which he has now, starts with just those symptoms of neurasthenia, the weakness and debility and all those symptoms. Q. Were those the symptoms which manifested themselves in 1927? A. Yes. Q. Now, Doctor, a great many cases of dementia praecox are preceded with neurasthenia; that is right, isn't it? A. Yes; you could have neurasthenia with a dementia praecox. Q. And the symptom that was developed with respect to the milk was a symptom that might develop with neurasthenia? A. Yes, I think that it is. Q. And it was just an isolated symptom, and doctors never put any particular significance in one isolated symptom of that kind, it has to repeat itself several times before any medical significance is attached to it? A. Well, it should—it has a significance, but it must continue before you can make a mental diagnosis.''

The doctor further testified that the last time he examined insured prior to May or June, 1920, the latter's lungs, heart, muscles, kidneys, liver and bladder were all apparently in good condition. ''Q. And, so far as his physical condition was concerned, he was in good condition, wasn't he? A. Well, at that time he was in good condition for him; he was in fair condition, but he was below par; he was in good condition for him prior to this attack which started in May, 1930. Q. That was in 1930—That is all.''

Dr. B. E. Miles, a witness for the defendants, testified that he was a physician at the St. Joseph Hospital for the Insane; that he examined insured after his entrance to that institution and that, ''I found him suspicious regarding his food and water he drank. I might say that I found him expressing delusions. He also admitted that he was afraid that somebody was going to injure him;'' that he diagnosed insured's condition as dementia praecox; that as a rule this ailment comes on gradually, ''I would say over a period of time, but I would not care to specify the period of time. . . . Symptoms may be observed at home for a number of months, . . . before we receive them at the State Hospital.''

Defendants' witness, Dr. J. R. Bunch, testified that he was a physician for the State Hospital for the Insane at St. Joseph; that he observed insured after he came to the hospital but did not make a complete examination of him; that he was of the opinion that insured was suffering from dementia praecox; that this condition comes on gradually. Asked what he meant when he said that this disease came on gradually, whether he meant it would come on in a week, a month or a longer period of time, he stated: "Oh, no; a longer period; a month or several months, maybe longer; maybe two or three years." On cross-examination he stated that he would not express his opinion as to how long insured had been affected, prior to his entrance into the hospital.

The written claim made by the defendant, Ruby Erdwins, stated that insured first became totally disabled by reason of a mental derangement on March 24, 1930. Attached to the claim was an attending physician's certificate, which was signed by Dr. Payne and dated August 6, 1930. It recited that insured's symptoms were:

"General debility gradually increasing until compelled to rest in bed, too weak to be up, great fear, times when appeared too weak to talk, family think he was dying, then after rest in bed for several weeks he gained strength, got out and developed mental symptoms. Imagined he was being poisoned by someone interfering with medicine, great fear;" and that insured was in the "same condition, in light form in September, 1927."

Another attending physician's certificate was attached to the claim, signed by Dr. Bunch, on September 9, 1930, in which the doctor stated that insured's "physical health is very good and he shows some mental improvement. Prognosis favorable. 9. State the history of the illness and give the date of its onset and the date treatment was first accorded as given by the patient when you were first consulted. According to patient's statement gradually progressing for past three years. First treatment, July 8, 1930."

Plaintiff's local agent, who solicited insured for the policy, testifying for the plaintiff, stated that at the time he solicited insurance from the insured he saw the latter plowing in his field; that he talked to him for some little time; that he had seen him only once before that time; that at this time insured appeared to be in good health; that he talked and looked like a man in good health and looked like a good risk.

In connection with the application for the insurance insured was examined by plaintiff's medical examiner, Dr. Ryland. A part of the application consisted of a written report of the medical examination made of insured by the doctor and the doctor certified that insured appeared to be in good health. The following appears as a part of the medical examination:

"13. *Does thorough physical examination and inquiry show any evidence of disease or impairment?*
"*Full details of impairment.*
"(*State whether past or present*)
"Answer Yes or No.
"(a) Of the Brain or Nervous system? No."

The doctor in his report stated that insured had no disease or impairment of the circulatory or respiratory system, the liver, intestines, stomach, the skin, glands, thyroid, ears, eyes, or ganito-urinary organs; that he considered the application a first class risk.

The doctor was called as a witness for the plaintiff and he testified: "Q. From your examination, so far as it went, did you—what did you do with regard to recommending the risk to the company? A. I recommended him as a first class risk; so stated on this blank." . . . On cross-examination he was asked: "Q. Everything about him that you could ascertain in examining him was in first class condition? A. I thought so. Q. And you considered him a first class risk for an insurance policy with any company? A. I did; I so recommended him on the blank there." Upon re-direct examination the court refused an offer of proof made by the plaintiff to the effect that the doctor, in expressing his opinion that the insured was a good risk, took into consideration the history as given him by the insured as set forth in the application for the insurance. The objection to the question, which was sustained, was upon the ground that the "report shows for itself upon what he based the opinion."

The defendant, Ruby Erdwins, testified that during the year 1927 she remembered her husband having a sick spell; that in the fall of the year he had an attack of the "flu;" that Dr. Payne came to see him once; that the sickness lasted but one day; that Dr. Payne came again one time shortly after this and treated insured and two of the children for milk poisoning; that insured was sick this time for two or three days; that her husband visited Dr. Payne at his office in Lexington about three times a week covering a period of two months in the fall of 1927; that the treatment that the doctor gave him was tablets for his acid stomach; that sometimes insured would take these tablets two or three times a day and sometimes not quite so often; that during this time her husband was not "quite sick, he was taking treatments, but he wasn't sick to his bed." "Q. But he was ailing and he wasn't well during that time; is that correct? A. Not as I know of, no, sir. Q. You think he was hale and hearty during all of that period? A. Yes, sir. . . . Q. But he continued to see Doctor Payne along through 1928, didn't he? . . . not quite so often, however? A. Yes, I think so. Q. He took some injections in his arm during that time? A. Yes, sir. Q. That extended over a period of time, too, didn't it, that

type of treatment, he took those on numerous occasions? A. Taken them for a while, but I don't know how long."

John C. Erdwins, testifying for defendants, stated that he was a brother of the insured; that he lived in the vicinity of the insured and that the two visited each other frequently. He testified that the first time he observed anything wrong with the mental condition of insured was when the latter had a nervous breakdown in the spring of 1930; that prior to that time he did not observe anything that would indicate that there was anything wrong with insured; that, in his opinion, he was sane prior to that time; that within five years prior to the spring of 1930 insured "had some little things that didn't amount to much, that I would perhaps call sick;" that prior to 1926 he lived with insured part of the time; that he did not remember of insured having any protracted spell of illness requiring the attendance of a physician in the year of 1927; that during that time insured's health was "very good, as a whole, very good, he was a very hard worker;" that he didn't think that insured was under the treatment of a doctor during that time. "I don't think he was; perhaps he had some little illness that he went to see the doctor about, but I don't recall that he did;" that he saw insured frequently during 1927. "Q. Didn't you tell Dr. Bunch at the hospital, when you first took Pete there, that his condition had been gradually progressing for the past three years? A. Probably I did. . . . I don't remember what I told him, exactly."

William Erdwins, testifying for the defendants, stated that he was the father of the insured; that he lived in the vicinity of the latter; that prior to May or June, 1930, he saw insured frequently; that insured, in the opinion of the witness, was sane. On cross-examination he testified: "Q. Dr. Erdwins, what was the matter with Pete in 1927, that you observed? A. Nothing that I remember; might have been that he didn't feel just right. Q. Don't you know about him being sick in 1927? A. No, sir. Q. Didn't you know about that? A. No, sir." That he did not recall insured being sick in the year 1927; that "he worked every day;" that he thought Dr. Payne was out to see him at one time when insured had the "flu;" that he did not know whether this was in 1930 or not. "Q. Don't you know, Mr. Erdwins, that Pete was under the regular care of a doctor from September until early in December, of 1927? A. No. Q. Don't you know that? A. No, sir. Q. Don't you know, that he was sick all during 1928? A. No. Q. Don't you know that during 1928 he visited a doctor for treatments with more or less regularity? Don't you know that? A. No, I never noticed any of them."

Mrs. William Erdwins, testifying for the defendants, stated that she was the mother of insured; that the first time she noticed anything wrong with the mental condition of insured was about the

beginning of June, 1930; that she was of the opinion that prior to that time insured was sane. On cross-examination she testified that she did not know that insured was sick in 1927; that he was "down three days" with the "flu" but she did not know what year that was; that during 1927 "he maybe got him a little medicine or something from the doctor, but I don't know whether he was under regular treatment."

Ralph Erdwins testified that he was a brother of the insured; that he visited insured a "few times" and the latter visited his home; that prior to insured's breakdown in the spring of 1930 he did not observe anything about insured to indicate there was anything wrong mentally with him; that prior to that time he was of the opinion that insured was sane.

B. M. Little testified that he was president of the defendant, Traders Bank; that he saw insured during the years of 1927 and 1928 in his bank in Lexington where insured was a customer; that he was in the bank frequently. "Q. State to the court when it was, Mr. Little, that you, yourself, first noticed or observed that there was anything wrong with Pete's mental condition? A. It was in his illness that just preceded his going to St. Joe; I was totally surprised, because I had no intimation there was anything wrong with him at all until that final illness before he left. . . . I had every reason to think him sane; he transacted his business like any normal man would; I was totally surprised that he found it necessary to go to St. Joe."

As before indicated, the only matter in dispute on this appeal is whether the court committed error in refusing to cancel that part of the policy providing for total and permanent disability and in rendering judgment in favor of the defendant, Ruby Erdwins, in the sum of $780.

The contingency or event upon which the part of the policy in question became due and payable occurred prior to the filing of this suit. Therefore, plaintiff could not, without the consent of the defendants, maintain this action insofar as it sought relief by cancellation of the disability clause of the insurance. [Sec. 5732, R. S. 1929; Aetna Life Ins. Co. v. Daniel, 42 S. W. (2d) 584; Pac. Mut. Ins. Co. v. Glaser, 245 Mo. 377; Kern v. Supreme Council, 167 Mo. 471; Willums v. Mut. Ben. H. & A. Assn., 46 S. W. (2d) 259.]

Section 5732, Revised Statutes 1929, reads as follows:

"No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this State, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury."

Defendants were not compelled to litigate, in this proceeding, the question as to whether insured was guilty of misrepresentations actually contributing to the contingency or event on which the part of the policy in question became due and payable. But instead of standing on their rights defendants, Ruby Erdwins and Pete Erdwins, filed joint and separate answers containing in part a cross-bill alleging that insured was suffering from a mental ailment which was totally and permanently disabling; that the defendants had performed all of the conditions to be performed by them under the policy and that defendant, Ruby Erdwins, was entitled to the payment of the disability benefit under the provisions of said clause in the policy.

The answer of the bank claimed an interest in the policy by reason of an assignment thereof for the security of the payment of an indebtedness due it. No pleading or motion appears in the abstract except the said answers of the defendants.

It is insisted by the defendants that so far as their cross-bill is concerned, this is an action at law. If this be true, there being no declarations of law or findings of fact asked or given by the trial court, we must uphold its judgment if it can be done so on any theory. If it be an action at law this court is not permitted to weigh the testimony, but if there is any substantial testimony in the record to uphold a theory that the misrepresentations made by the insured in the application did not contribute to the contingency or event upon which the clause in question of the policy became payable, that is, the total disability of the insured by reason of a nervous breakdown and insanity, the judgment must be affirmed. [Early v. Helmaring, 170 Mo. 597; Lelly v. City of Richmond Heights, 18 S. W. (2d) 401.] No authority is cited by defendants in support of their contention that a defendant, by filing a cross-bill, pleading a legal cause of action, can convert a suit of this character into one at law. There was no objection made by the defendants to the trial of this suit as one in equity and as it was tried by all parties on the theory that it was an equitable proceeding *in toto* the cause will be tried in this court upon the same theory. [Dudley v. McCluer, 65 Mo. 241, 242; Crocker v. Barteau, 212 Mo. 359; Ellis v. Ott, 217 S. W. 588.]

There is no question but that, under the circumstances, this court can fully and completely dispose of the issues in this case upon the theory that it is an equity proceeding *in toto*. [Quest v. Johnson, 58 Mo. App. 54; McMurray v. McMurray, 258 Mo. 405.] This being a proceeding in equity, it is the duty of this court to view the testimony and come to its own conclusions in reference to the issues. [England v. England, 39 S. W. (2d) 429, 432.] However, the controversy is governed by Section 5732, Revised Statutes 1929. [See Aetna Ins. Co. v. Daniel, supra, l. c. 588.]

After reviewing the testimony we are of the opinion that the insured at the time he applied for the insurance was guilty of misrepresentations concerning his health and that such misrepresentations contributed to cause his ailment upon which the beneficiary bases her claim for total disability. In the application for the insurance insured stated that his present condition of health was good and that his last ailment was in February, 1920, which illness consisted of influenza and lasted eighteen days; that he had not been attended by a physician for a period of five years.

That these were clear and positive misrepresentations cannot be denied. The only question over which there can be any controversy is whether they contributed to insured's illness.

The evidence of Dr. Payne shows that defendant, Pete Erdwins, was ill during the fall of 1927. A patient who requires such character and frequent medical attention as was given him by the doctor during this time could not be said to be suffering from a mere inconsequential illness. According to this doctor, as well as the testimony of insured's wife, he treated insured at least three times a week during this time. Aside from this insured took medicine at home several times a day. He was suffering from neurasthenia and his stomach trouble was a mere symptom of a nervous ailment. Dr. Payne testified that while neurasthenia does not always result in dementia praecox it is often a forerunner of this derangement. The undisputed evidence shows that in 1927 insured suffered a hallucination that someone had poisoned his cows. Dr. Payne testified that while he noted this peculiar circumstances at the time it happened that after an elapse of time he attached no significance to it because it was not repeated. However, when insured finally suffered a nervous breakdown and became insane he did attach importance to this symptom and in the certificate attached to the claim of the defendant, Ruby Erdwins, for disability suffred by the insured, he stated that the condition that insured was in on August 6, 1930, which was after he became insane, was the same condition, in a light form, which insured was suffering from in September, 1927. It will be noted from the certificate of the doctor that after insured became insane one of the hallucinations that he was suffering from was that "he imagined he was being poisoned," a hallucination similar to the one he had in 1927. Along the same line we find Dr. Miles, a physician at the St. Joseph Hospital for the Insane, who testified for the defendants, stating: *"I found him suspicious regarding his food and water he drank. I might say that I found him expressing delusions. He also admitted that he was afraid that somebody was going to injure him."*

The evidence shows that dementia praecox comes on gradually. It also fairly shows that insured evidenced, in 1927, symptoms that afterwards developed into dementia praecox with intervals when

these symptoms were not present. In this connection, there is evidence that insured's mental condition improved and he was paroled from the hospital on August 6, 1930, but his condition again changed for the worse and he was compelled to return to the hospital on February 6, 1931. The fact that he appeared to be physically sound does not militate against the idea that he was suffering from the early stages of a mental breakdown in 1927 and 1928, for the reason that the evidence shows that, even after he became insane and was incarcerated in the asylum, his physical condition still was good. The attending physician's certificate signed by Dr. Bunch, dated September 9, 1930 (which was after insured became insane), attached to the claim and furnished by defendants, Pete Erdwins and Ruby Erdwins, recites: "*Physical health is very good* and he shows some mental improvement. Prognosis favorable."

It is therefore, not surprising that the witness, Little, president of the defendant bank, did not notice anything wrong with the mental or physical condition of insured. The same may be said of the soliciting agent, Bosch. It will be recalled that the bank loaned the insured money after he had been committed to the asylum. (Of course, while he was on parole.)

We give very little credence to the testimony of the father, mother and brother, John C. Erdwins, of insured. They sought to minimize the sickness of the insured in the fall of 1927 and, in fact, one of them refused to admit that he was sick at all, or at least, that he had heard of it. They either did not see insured sufficiently often to know of his condition or were not entirely frank in their testimony relative to the same. While, the examining physicians, Dr. Ryland, testified that he recommended insured as a first class risk, it will be noted that that part of the application which the doctor made out indicates that his report was not necessarily based solely upon the physical examination of insured but could have been founded, in part, upon "inquiries" he had made. In this connection plaintiff sought to show by the witness that the latter took into consideration the history given by the insured in making his report. Of course, as before stated, that part of the application made out by insured was false in material respects. If the testimony of John C. Erdwins was of otherwise any benefit to the defendants, it was discredited by his admission that he perhaps told Dr. Bunch that insured's condition had been gradually progressing for the past three years.

It will be remembered that this application for·the insurance was signed by insured on the 15th day of May, 1929; that on March 24, following, or approximately ten months thereafter, his present condition of total and permanent disability commenced. We are unwilling to give our sanction to a recovery under the circumstances. In his application, insured unquestionably misrepresented the facts

450

concerning his health. The elapse of only a few months occurred until he became disabled on account of an ailment which he showed marked symptoms of in the fall of 1927. As before stated, we are of the opinion that insured was guilty of misrepresentations of matters regarding his health that contributed to his disability. Therefore, the chancellor erred in rendering judgment in favor of the defendants on their cross-bill.

The judgment in favor of defendant, Ruby Erdwins, is reversed. All concur.