828 P.2d 952

**CRAWFORD CHEVROLET, INC.,
a New Mexico corporation,
Plaintiff–Appellee,**

v.

**The NATIONAL HOLE–IN–ONE
ASSOCIATION, a Texas insurer,
Defendant–Appellant.**

**No. 19954.**

Supreme Court of New Mexico.

April 1, 1992.

Campbell, Carr, Berge & Sheridan, Annie Laurie Coogan, Santa Fe, for defendant-appellant.

Rubin, Katz & Alley, Owen Rouse, III, Santa Fe, for plaintiff-appellee.

## OPINION

MONTGOMERY, Justice.

On July 9, 1990, the City of Santa Fe and Quail Run Association, Inc., sponsored a pro-am golf tournament at the Quail Run Golf Course in Santa Fe. Plaintiff Crawford Chevrolet, Inc. ("Crawford"), a Santa Fe automobile dealership, agreed to provide a new vehicle to any participant who scored a hole-in-one on a certain hole during the tournament. Crawford obtained insurance through defendant National Hole-in-One Association ("Hole-in-One"), a company that insures golf tournament sponsors, such as Crawford, against the risk that a player will score a hole-in-one and the sponsor will have to deliver the prize.

The application for insurance required Crawford to designate certain "Target Hole Data": the target hole (for which Crawford would award a prize to any player scoring a hole-in-one on that hole), the yardage to the target hole green, and the

number of "shots" to be taken on the target hole. Accordingly, Crawford filled in the following information: Hole: "#9," yardage: 165, and shots: 65. Crawford listed the value of the prize vehicle as $19,736.00.

The back of the application contained a provision requiring Crawford to notify Hole-in-One prior to the tournament of any change in the number of shots. It stated:

NUMBER OF SHOTS

Each category of shots specified on this Certificate permit[s] a 10% variance, plus or minus (+ or −), without a change in the certificate fee. Shot variance greater than 10% must be reported to NHIO prior to tournament. Certificate fee adjustment will be billed after the tournament. IMPORTANT: The prize value will be prorated downward if a Hole-in-One occurs and the number of shots has been understated by more than the allowed 10% variance. (Example: Number of shots insured divided by number of shots taken times the prize value = Amount Paid.)

After Crawford completed the application, Hole-in-One sent Crawford a "Certificate Of Participation," along with a letter dated July 6, 1990, reminding Crawford to inform Hole-in-One before the tournament of "any variance in the number of players." Accordingly, on the following day Crawford faxed a letter to Hole-in-One, informing it that the number of players would be 60 rather than 65.

Sixty players participated in the tournament on July 9. The course was a nine-hole course, which was played twice, for a game of eighteen holes. Don Zamora, a professional golfer from Albuquerque, scored a hole-in-one on physical hole #9, but on his second time around the course— i.e., on the eighteenth hole in the tournament. Crawford delivered the prize vehicle to Zamora and made a claim to Hole-in-One for coverage.

Hole-in-One denied coverage on the ground that the hole-in-one occurred on hole #18, which was not the target hole designated in the insurance application. It claimed that the contract only provided coverage for a hole-in-one scored on physical hole #9 when that hole was being played the first time around the nine-hole course; it did not provide coverage for a hole-in-one scored the second time around on hole #9.

Crawford brought an action against Hole-in-One on September 11, 1990, alleging breach of contract. It argued that the meaning of "hole #9" was ambiguous and should therefore be construed in favor of the insured so as to provide coverage. Both parties filed motions for summary judgment. The trial court ruled in favor of Crawford, awarding it $19,796.00 in damages and costs.[1]

On appeal, Hole-in-One argues that the contract is unambiguous. It contends that there is clearly no coverage because the hole-in-one occurred on the eighteenth hole, while the contract only insures against a hole-in-one on the ninth hole. In the alternative, Hole-in-One argues that, if we find coverage here, we should reduce the damages awarded by the trial court because Crawford understated in its application the number of shots actually taken on the target hole.

This case, while raising a seemingly straightforward issue of contract interpretation, has been surprisingly difficult to resolve. The issue has provoked controversy between golfers and nongolfers, both in the general public and on this Court. However, after thoroughly reviewing the record, we believe that the contract provides coverage under the facts in this case.

■ In determining whether an ambiguity exists in an insurance contract, we con-

---

1. The parties' contract required them to submit any dispute to binding arbitration in Texas. Pursuant to this requirement, Hole-in-One initially moved to stay the lawsuit pending arbitration. However, the parties subsequently agreed to submit motions for summary judgment and allow the court to decide the case if there were no genuine issues of material fact. If the court were to determine that there was a factual issue, the parties agreed that they would then submit the case to arbitration. The court approved this agreement and, in ruling in favor of Crawford, found no genuine issue of material fact.

sider the policy as a whole. *See Ivy Nelson Grain Co. v. Commercial Union Ins. Co.*, 80 N.M. 224, 226, 453 P.2d 587, 589 (1969). We begin by reviewing the "Target Hole Data" on the application. Hole-in-One argues that these data—consisting of the designated target hole, the yardage on the target hole green, and the number of "shots"—clearly show that the contract, considered as a whole, only provides coverage for a hole-in-one scored on hole #9 on a player's first time around the course. Its strongest point is that Crawford only specified 60 shots on the application. Arguably, if Crawford had intended to purchase coverage for a hole-in-one scored on the first *or* second round of the course, it would have specified 120 shots (60 golfers each playing the ninth hole twice). Hole-in-One also relies on a warranty provision on the back of the application, which states: "TARGET HOLE—Only one predesignated hole may be used on the target hole green. Nine (9) hole courses must specify which hole(s) will be eligible during the official insured round. Insurance does not apply unless prize is offered on the *EXACT* target hole as specified in this certificate."

On the other hand, Crawford argues that the contract is ambiguous because "hole #9" is subject to at least three different interpretations: physical hole #9, on either the first or second round of the course; physical hole #9, but only the first time around the course; and the ninth hole played, regardless of whether it is physical hole #9. (The players in this tournament started at different holes.) According to Crawford, because the contract is ambiguous, it should be construed in favor of the insured so as to provide coverage for Zamora's hole-in-one.

We agree with Crawford that the contract is ambiguous, but for a different reason. We believe that the term "shots" is ambiguous because it could mean either the number of *attempts* to score a hole-in-

one on physical hole #9 (in this tournament, 120) or the number of *golfers* playing physical hole #9 (in this tournament, 60). If "shots" has the latter meaning, the contract would insure against Zamora's hole-in-one because coverage would not be restricted to a hole-in-one scored on the players' first round on the nine-hole course.

■ The existence of this ambiguity does not result in an automatic decision in favor of the insured. The rule of construction that an ambiguity in an insurance contract should be construed against the insurance company which drafted the form, *see King v. Travelers Ins. Co.*, 84 N.M. 550, 555, 505 P.2d 1226, 1231 (1973), is just that—a rule of construction that courts may use in interpreting policy language. It does not preclude a court from examining the facts of a case to determine what the parties intended the contractual language to mean.[2] *See* 2 George J. Couch, *Couch Cyclopedia of Insurance Law* § 15:74, at 357 (2d ed. rev. vol. 1984) ("The rule, moreover, that an insurance policy will be strictly construed against the insurer does not apply when the barrier against parol evidence has been removed by an ambiguity in the contract, and the parties thereto, by their acts, have placed a construction on the contract showing what was in fact intended.").

■ Unfortunately, "shots" is not defined in the application, and the parties have not directed our attention to any possibly applicable definition of "shots" in the Rules of Golf promulgated by the United States Golf Association. Nevertheless, the record indicates that the parties intended "number of shots" to mean "number of players." The "Certificate of Participation," issued to Crawford by Hole-in-One, lists the Target Hole Data supplied by Crawford. One line of the Certificate states: "CATEGORY OF SHOTS: 48 AMATEURS, 12 CLUB PROS." A layman reading this line could easily understand

---

**2.** We might have favored a ruling that, because the contract is ambiguous, the trial court should have remanded the matter to the arbitrators for a factual determination, based on extrinsic evidence, of the parties' intent. However, counsel for Hole-in-One conceded at oral argument that she had abandoned this position, and the parties agreed that the issue should be resolved by this Court as a matter of law.

that the number of "shots" means the number of "players." This understanding is reinforced by the application, which lists the number of players as 52 amateurs, 1 club pro, and 12 tour pros, for a total of 65 (later amended to 48 amateurs and 12 tour pros). The same figure of 65 then appears as the number of "shots" under the Target Hole Data. The application never informs the applicant that, in an eighteen-hole game played on a nine-hole course, the number of shots is twice the number of players if the applicant intends to insure the physical hole on both the first and second rounds of play.

We also rely on the July 6 letter from Hole-in-One to Crawford, in which Hole-in-One referred to the number of shots as the number of players. As indicated previously, Hole-in-One in that letter reminded Crawford of the provision on the back of the application, quoted above, requiring Crawford to notify Hole-in-One before the tournament of any *shot variance* greater than ten percent. Hole-in-One wrote: "See 'premium adjustment conditions', shown on back side of certificate, for any variance in number of *players*." (Emphasis added.) This letter reinforces the conclusion that the parties intended "number of shots" to mean "number of players." [3]

In the world of golf, perhaps the term "shots" has a universally accepted meaning: the number of attempts to achieve a hole-in-one on a particular hole. However, among nongolfers, including some but not all of the members of the panel deciding this case, the meaning of "shots" is far from self-evident. And, in any event, the question is not what a knowledgeable golfer would understand the term to mean, but the meaning that a layman—by which we mean neither a golfer, nor a lawyer, nor an insurance underwriter, but an ordinary (reasonable) person, such as a new or used car dealer—would ascribe to it. *See Ivy Nelson*, 80 N.M. at 225, 453 P.2d at 588 ("[T]he words in a contract of insurance are given their ordinary meaning, and, where there is ambiguity, the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean."). Accordingly, because we find the parties intended that "number of shots" meant "number of players," we interpret the contract as providing insurance against the risk that any of the 60 players might score a hole-in-one on hole #9, either on his or her first or second time around the nine-hole course.

The warranty provision on the back of the application relating to the target hole on a nine-hole course, quoted above, does not cause us to change this interpretation. We believe that the provision is itself ambiguous. Arguably, it applies only to an eighteen-hole tournament in which there are two different physical holes on any particular green in a nine-hole course—*i.e.*, when, on the second time around a nine-hole course, a golfer plays to a different physical hole on a given green. The Rules of Golf clearly contemplate such a situation by authorizing a committee to designate two holes on each green of a nine-hole course, one for use in play of the first nine holes and the other for use in play of the second nine. *See* Decisions on the Rules of Golf 16/7 (1991) ("Two Holes on Each Green of Nine–Hole Course").[4]

Thus, we hold that the contract between Hole-in-One and Crawford provides coverage for Zamora's hole-in-one scored on physical hole #9 while he was playing his second round on the nine-hole course.

---

**3.** We realize that Hole-in-One may not have subjectively intended the number of shots to equal the number of players. However, "[t]he controlling intent of a party is his expressed assent and not his secret or undisclosed intent." *Southern Union Exploration Co. v. Wynn Exploration Co.*, 95 N.M. 594, 597, 624 P.2d 536, 539 (Ct.App.), *cert. denied*, 95 N.M. 593, 624 P.2d 535 (1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 461 (1982). *See also* 2 Couch, *supra*, § 15:11, at 154 (intent to be given effect in construing insurance contracts is not secret, unexpressed intention of one or all parties, but intention which finds expression in the language used).

**4.** Counsel for Hole-in-One conceded at oral argument that this provision introduced some ambiguity into the contract. However, she argued that other provisions of the contract dispelled this ambiguity.

Our conclusion that the parties intended "number of shots" to mean "number of players" allows us to quickly dispose of Hole-in-One's alternative argument that we should reduce the trial court's award of damages because Crawford understated the number of shots. Because "number of shots" meant "number of players," Crawford did not understate the number of shots taken on hole #9. Crawford informed Hole-in-One that 60 players would participate in the tournament, and that number never changed. Thus, there was no "shot variance" and no basis for reducing the trial court's damage award.

■ We reject Crawford's request in its answer brief for attorney's fees under NMSA 1978, Section 39–2–1 (Repl.Pamp. 1991), which permits the trial court to award reasonable attorney's fees to an insured who prevails against the insurer on a claim for first-party coverage if the court finds that the insurer "acted unreasonably in failing to pay the claim." Crawford did not make this request in the trial court, and we will not consider it now on Hole-in-One's appeal. *See Wolfley v. Real Estate Comm'n,* 100 N.M. 187, 189, 668 P.2d 303, 305 (1983) (matters will not be considered when raised for the first time on appeal).

The judgment is affirmed.

IT IS SO ORDERED.

BACA, J., concurs.

RANSOM, C.J., specially concurs.

RANSOM, Chief Justice (specially concurring).

I have found it difficult to see any ambiguity in the risk underwritten by Hole-in-One, namely, sixty shots on the ninth hole as carded by each player. Mr. Zamora carded his hole-in-one as the eighteenth hole while playing number nine the second time. However, I am persuaded that, as nongolfers and ordinary persons, my colleagues on this panel, along with the trial judge, reasonably could ascribe to and resolve ambiguity in the meaning of "shots" and "holes." I, therefore, reluctantly concur.