891 P.2d 1206

**Edward B. CROW, Plaintiff–Appellant,**

v.

**CAPITOL BANKERS LIFE INSURANCE COMPANY and Jean Cooley, individually and as agent for Capitol Bankers Life Insurance Company, Defendants–Appellees.**

No. 21099.

Supreme Court of New Mexico.

March 1, 1995.

James R. Beam, Albuquerque, for appellant.

Gallagher, Casados & Mann, Michael P. Watkins, Doris W. Eng, Albuquerque, for appellee Capitol Bankers Life.

Keleher & McLeod, Henry F. Narvaez, Susan M. McCormack, Albuquerque, for appellee Jean Cooley.

## OPINION

FROST, Justice.

In applying for a life insurance policy from Capitol Bankers Life Insurance Company (Capitol), Edward and Kathy Crow made misrepresentations about Kathy's health history. As required by New Mexico law, the policy contained an incontestability clause, stating that, after two years from the date the policy was issued, the coverage could not be challenged. Kathy died of ovarian cancer less than two years after the policy was issued. Upon learning of the misrepresentations, Capitol denied payment of death benefits to Edward. Edward filed suit claiming that the incontestability clause prevented Capitol from challenging the policy.

We conclude that the incontestability clause should not be enforced because the language of the insurance contract required that the insured be alive for the entire two-year period. We also conclude that, because there is strong evidence in the record of fraud and misrepresentation on the part of the Crows, Capitol properly refused to award the death benefits to Edward.

## I. FACTS

Kathy Crow, a registered nurse, was diagnosed with ovarian cancer in October 1985. From the date of the diagnosis through the time of her death in 1990, she was under almost continuous care for cancer. She first met with Dr. George Ritcher, a specialist in gynecologic oncology, on October 2, 1985. Upon discovery of the cancer, she soon thereafter underwent a hysterectomy and an oophorectomy. Kathy then began a series of chemotherapy treatments that ended in July 1986.

A month after concluding the chemotherapy, on August 6, 1986, Dr. Richter performed a "second look" operation. Biopsies taken from various locations in her abdominal cavity revealed the continued presence of cancer. Dr. Richter suggested at trial that historically a large percentage of patients who have a positive second look will succumb to the disease. Kathy then underwent another year of chemotherapy which ended in August 1987. During the same year Kathy also had minor surgery to remove a kidney stone.

About the same time her chemotherapy treatments ended, in August 1987, Kathy married Edward Crow. The couple purchased a home the following month. In the mortgage paperwork they indicated they would like to be contacted by a life insurance agent. Shortly thereafter, Jean Cooley, an

agent for Capitol, contacted the Crows offering to sell them a policy. They told Cooley to call back after the first of the year in 1988.

In December 1987 Kathy complained of lower abdominal pain. New tests revealed evidence of a possible recurrence of cancer including a suspicious soft tissue mass in her pelvis.

Cooley called in mid-January 1988 and scheduled an appointment for February 25, 1988, to sell life insurance to the Crows. She came to their house on the appointed day and personally prepared two life insurance applications, one for Kathy and one for Edward.

Kathy's "HEALTH STATEMENT," as completed by Cooley, was in "PART C" of the application. Question 2(f) asked, "To the best of your knowledge and belief has the proposed insured within the last 10 years been treated for or had any known indication of . . . [a] stone or other disorder of kidney, bladder, prostate, or reproductive organs?" Cooley marked "Yes" to this question with the explanation that Kathy had suffered from a kidney infection and had a kidney stone removed. No problem with Kathy's reproductive organs was noted.

Most significantly, question 2(j) asked about any treatments or indications of "[c]ancer, cyst, or any tumor disorder of skin or lymph glands?" To this, Cooley marked Kathy's response: "No." Question 9(a) asked, "Has the Proposed Insured ever had any disorder of menstruation, pregnancy, or of the reproductive organs or breasts?" and Kathy's answer was "No." Cooley submitted the completed application documents to Capitol.

On March 23, 1988, Capitol issued the Crow's life insurance contract. Under the terms of the contract, this was the "Issue Date." Cooley delivered the documents to the Crows the same day. As required by New Mexico law, NMSA 1978, Section 59A–20–5 (Repl.Pamp.1992), the portion of the contract insuring Edward's life contained an incontestability clause. This clause provided that, "during the lifetime of the Insured," Capitol could not contest statements made in the application after two years from the issue date. Appended to Edward's insurance policy was the "OTHER INSURED RIDER" (Rider), which was a policy insuring Kathy's life. The Rider also contained an incontestability clause. It differed from the one in Edward's policy in that it lacked any reference to "the lifetime of the Insured." Husband and wife were each covered for $77,-900.00.

On March 25, 1988, two days after Cooley delivered the insurance policies, Kathy was informed by Dr. Richter that her cancer had recurred. Biopsies taken March 31, 1988, confirmed this diagnosis. Dr. Ritcher met with both Kathy and Edward on April 15, 1988, to discuss the alternatives for treatment. Five days later Kathy called Dr. Ritcher to tell him she wanted to continue aggressively fighting the disease with chemotherapy.

Apparently she continued with the chemotherapy until she went to Corpus Christi, Texas almost two years later in February 1990, to be with her family. She died on February 26, 1990. Her death certificate listed the immediate cause of death as "Aspiration Pneumonia" with "Papillary Adeno Carcinoma" as the significant condition that contributed to her death.

In March 1990 Edward called Cooley and told her Kathy had died. Cooley was "flabbergasted" when she learned that cancer was the cause of death and that Kathy "had it before." When Cooley asked Edward why the disease was not disclosed on the insurance application, he answered, "We thought she was all right."

Within a day or two Edward again called Cooley to ask if Capitol would pay the claim since the death certificate listed the immediate cause of death as aspiration pneumonia rather than cancer. Cooley replied that she did not know and indicated that her authority was limited to sending in the claim. She asked Edward again why he and Kathy had not disclosed the cancer. This time he asserted that Cooley had never asked them about it.

On March 6, 1990, Capitol opened its "Death Claim Checklist." Capitol mailed to Edward the "PROOFS OF DEATH—BENEFICIARY'S STATEMENT," which he

completed and returned to the insurance company on March 14, 1990. Edward listed the "Cause of Death" as "Aspiration Pneumonia." In response to the question, "When did deceased first complain of or give other indications of his/her last illness?" he answered "1–27–89" though Kathy's cancer was diagnosed in 1985. When asked, "When did deceased first consult a physician for his/her last illness?" he responded "2–2–90" though she had been treated by Dr. Richter as early as 1985. One question asked for the names of all physicians who attended Kathy during the final three years of her last illness, as well as the dates of attendance, and the condition treated. Edward listed a physician from the hospital in Corpus Christi where Kathy died as treating her from "2–2–90" to "2–26–90" for "Pneumonia Aspiration." With remarkable understatement, Edward also listed Dr. Ritcher, with no dates of attendance, as treating her for an "OBGYN Condition."

On April 23, 1990, Capitol wrote to Edward notifying him that, because Kathy's statements on Part C of the application constituted "a material misrepresentation of her health history," payment of the death benefits was being denied. Thus, despite the language of the incontestability clause, Capitol contested the policy after it had been in force for more than two years.

Edward filed a civil complaint on February 21, 1991, against Capitol and Cooley claiming breach of insurance contract, breach of covenant of good faith and fair dealing, and violation of the New Mexico Insurance Practices Act, NMSA 1978, §§ 59A–16–1 to –30 (Repl. Pamp.1992 & Cum.Supp.1994). Edward included an allegation that, because Capitol denied the benefits more than two years after the issue date, it was forbidden by the incontestability clause from challenging any statements made in the original application.

Capitol and Cooley responded with the affirmative defense of fraud and misrepresentation on the part of the Crows. Capitol also claimed that because Kathy died within two years of the Issue Date, the incontestability provision contained in her Rider became inapplicable, and the validity of the policy could therefore be challenged.

After a trial on the merits, a jury determined that Capitol did not breach the terms of the life insurance contract. The jury also found that Kathy made false statements to Cooley. The court awarded judgment for Capitol and Cooley.

On appeal, Edward asserts that the trial court erred by not enforcing, as a matter of law, the incontestability clause. We believe the trial court acted properly. The dispositive issues in this case are whether the incontestability clause was unenforceable and whether Kathy's misrepresentations on the insurance application released Capitol from its obligations under the contract. No other matters need be addressed.

## II. THE INCONTESTABILITY CLAUSE

New Mexico law requires that each life insurance policy contain "a provision that the policy ... shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of two (2) years from its date of issue." Section 59A–20–5. Accordingly, Edward's policy contained a clause that "[w]ith respect to the initial Specified Amount, we will not contest this policy after it has been in force during the lifetime of the Insured for the contestable period shown on the Schedule Page." The Schedule Page stated, "THE CONTESTABLE PERIOD IS 2 YEARS." The Rider that insured Kathy's life also provided that, "[a]fter two years from its Issue Date, this Rider shall be incontestable as to statements made in the application."

We base our decision in this case on a single narrow issue: whether this particular clause requires that the insured be alive for the entire two-year contestable period. We conclude, under traditional theories of contract interpretation, that the policy issued by Capitol required Kathy to be alive for two years from the issue date for the incontestability clause to be enforceable. We reach this conclusion even though Kathy's Rider lacked the "during the lifetime of the insured" language.

Edward wishes us to address whether Capitol properly contested the policy within the period specified by the clause. *See, e.g.,*

*Franklin Life Ins. Co. v. Bieniek*, 312 F.2d 365, 371 (3d Cir.1962) (discussing time period within which act of contesting policy must take place). Because the incontestability clause in this case was voided by Kathy's death, we need not address this matter. For the same reason we need not address Capitol's allegation that, the incontestability clause notwithstanding, when fraud is alleged, the validity of an insurance policy can be contested at any time. *See, e.g., Maxwell v. Cumberland Life Ins. Co.*, 113 Idaho 808, 811, 748 P.2d 392, 395 (1987) ("Since the [two-year] period has run in the instant case, all defenses premised on false statements in the application are precluded.").

## III. STANDARD OF REVIEW

Though certain elements of construction are unique to insurance contracts, generally they are construed by the same principles governing the interpretation of all contracts. *Vargas v. Pacific Nat'l Life Assurance Co.*, 79 N.M. 152, 155, 441 P.2d 50, 53 (1968). Incontestability clauses are no exception to this generality. 18 George J. Couch, *Couch Cyclopedia of Insurance Law 2d* § 72:10 (Ronald A. Anderson ed., Mark S. Rhodes rev., 1983).

 The clauses in question will be interpreted by their own terms and conditions. *Ansvar Am. Ins. Co. v. Hallberg*, 209 Ill. App.3d 206, 154 Ill.Dec. 77, 80, 568 N.E.2d 77, 80 (1991) ("[C]ourts should construe and enforce the contract as made."). To the extent that the insurance company in drafting the insurance form is responsible for the language of the policy, any ambiguity will be resolved in favor of the beneficiary. *See Crawford Chevrolet, Inc. v. National Hole-In-One Ass'n*, 113 N.M. 519, 521, 828 P.2d 952, 954 (1992). However, to the extent the wording of the incontestability clause is prescribed by statute, and not controlled by the insurance company, the language will not be strictly construed against the insurer. *See* 18 Couch, *supra*, § 72:10. Rather, the language will be interpreted so as to fulfill the statutory intent behind the required language.

## IV. INCONTESTABILITY CLAUSE IS VOIDED BY THE DEATH OF THE INSURED

 The phrase, "during the lifetime of the Insured" in the incontestability clause of Edward's policy has consistently been interpreted by other jurisdictions to mean that the insured must remain alive for the entire two-year period before the policy becomes incontestable. 18 Couch, *supra*, § 72:48; *see, e.g., Friedman v. Prudential Life Ins. Co.*, 589 F.Supp. 1017, 1020 (S.D.N.Y.1984) (stating insured must remain alive for the entire contestability period); *Downs v. Prudential Ins. Co.*, 130 N.J.Super. 558, 328 A.2d 20, 25–26 (Law Div.1974) (stating the same).

Since this phrase is derived from the statute, we will, under the standard of review just discussed, not construe it strictly against Capitol. The two-year limitation was not intended by the legislature to be an absolute bar to contestability. The "during the lifetime of the insured" language of Section 59A-20-5, was meant specifically to condition contestability on the survival of the insured for two years after policy was issued. *See Spilker v. William Penn Life Ins. Co.*, 251 N.J.Super. 480, 598 A.2d 929, 932–33 (App. Div.1991) (discussing similar New Jersey statute).

Edward asserts that the Rider should be read separately from his own life insurance policy. He emphasizes that the Rider's incontestability clause flatly requires the expiration of two years before the policy becomes incontestable. Unlike his policy, it makes no requirement that the policy be in force for two years "during the lifetime of the Insured." Thus he claims, under the clear and unambiguous language of the Rider, Kathy's death would not preclude the clause from being enforced.

 It is a basic tenet of contract construction that a "memorandum may consist of several writings." Restatement (Second) of Contracts § 132 (1979). If two or more writings are part of a single transaction and concern the same subject matter, then they are a single contract. *Massey v. Galvan*, 822 S.W.2d 309, 315 (Tex.Ct.App.1992). Whether multiple documents consist of a single con-

tract is determined by considering the intentions of the parties and the surrounding circumstances. *Master Builders, Inc. v. Cabbell*, 95 N.M. 371, 374, 622 P.2d 276, 279 (Ct.App.), *cert. denied*, 95 N.M. 426, 622 P.2d 1046 (1981). Edward's insurance contract and the Rider are to be read as a single contract as long as the circumstances establish that they relate to the same transaction. *See* Restatement (Second) of Contracts § 132 (1979).

■ The language of the policy shows that the two writings were intended by the parties to be a single contract. The "SCHEDULE PAGE," which is the first sheet after the cover page, contains the statement that "THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS SHOWN BELOW," suggesting that, while the Rider may have certain additional provisions, it actually incorporates the terms of Edward's policy. The Rider, contained entirely on the tenth sheet of the policy, begins with the statement, "Based on the application for this rider and the payment of the premium, *this rider is made part of this policy.*" (Emphasis added.) The last paragraph of the Rider, entitled "RIDER PART OF POLICY" provides:

> This rider is attached to and made a part of this policy as of the Issue Date of this rider in return for the application and payment of premiums. The Issue Date of this rider is the Issue Date of the policy to which it is attached, unless a different date is shown below.

The same paragraph also states that "[a]ll the provisions of the policy apply to this rider, except those that are inconsistent with this rider." Under the contract doctrine discussed herein, any inconsistency between the two incontestability clauses in question is immaterial. The policy and the Rider are unquestionably to be construed as parts of a single transaction within a single memorandum.

Another basic principle of contract construction is that "[a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2) (1979); *Crawford Chevrolet*, 113 N.M. at 520–

21, 828 P.2d at 953–54. Edward urges that, because the Rider lacks the "lifetime of the Insured" language, we should isolate its incontestability clause from the rest of the contract. This approach would violate the principle that no part of the contract can be isolated and interpreted distinctly from the rest of the contract. *Madawick Contracting Co. v. Travelers Ins. Co.*, 307 N.Y. 111, 120 N.E.2d 520, 523 (1954) ("Each portion of an agreement is qualified by other portions that are relevant thereto, and has no separate existence apart from them."). Moreover, the entire contract is to be considered in the interpretation of any individual part. Each word, phrase, and section of a contract should be analyzed in its context within the contract as a whole so as to realize the intentions of the parties. *Brown v. American Bank of Commerce*, 79 N.M. 222, 226, 441 P.2d 751, 755 (1968); *see* Restatement (Second) of Contracts § 202 cmt. d (1979) ("Meaning is inevitably dependent on context.").

Our conclusion that the Rider's incontestability clause cannot rationally be isolated and distinguished from the clause in Edward's policy is supported by several arguments. First, the "during the lifetime of the insured" language is required by New Mexico statute. *See* § 59A–20–5. Under traditional contract theory, state laws are incorporated into and form a part of every contract whether or not they are specifically mentioned in the instrument. *State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 130, 812 P.2d 777, 784 (1991). Edward does not claim there is a fault in the language of the statute. The language of Section 59A–20–5, is thus a part of the entire contract and cannot be isolated from any individual section. Though not specifically mentioned, the "lifetime of the insured" language of the statute was implicitly incorporated into the incontestability clause of the Rider.

A second important reason for refusing to distinguish the Rider's incontestability clause is that the interpretation urged by Edward violates public policy. A contract is unenforceable if it violates public policy, especially public policies that engender the writing of statutes. *See Udall*, 112 N.M. at 130, 812

P.2d at 784 (state contract with investment broker who provided illegal investment advice was not enforceable). The incontestability clause promotes two important public policies. First, it protects the insurance company by giving it an adequate window of time in which to investigate an application for life insurance so as to discover any material misrepresentations on the part of the applicant. Second, it protects the insured from having to defend against a possibly specious challenge long after acquisition of the policy. *See Maxwell*, 113 Idaho at 811, 748 P.2d at 395 (stating that the incontestability clause "prevents the insurer from lulling the insured into a sense of security, only to litigate the issue later, possibly after the death of the insured"); 18 Couch, *supra*, § 72:2 (stating a similar idea). Thus, by requiring prompt investigation of statements made in an insurance application, the clause furthers the public policy of denying protection to those who make fraudulent claims. The "during the lifetime" wording is part of that public policy. If the insured dies of a serious illness a short time after obtaining a life insurance policy, the insurance company should be permitted to investigate in contemplation of a challenge. It would be against public policy for the Rider in the instant case to prevent Capitol from investigating the fact that Kathy died of cancer a short time after representing to the insurance company that she had no such disease. The public policy behind the "during the lifetime" language of Edward's policy is equally a part of the Rider though not expressly articulated.

Finally, no rational reason has been offered for making the incontestability clause of the Rider different from that of Edward's policy. It is possible to imagine some provisions of an insurance contract that would be different for husband and wife such as the premium cost or the amount of benefits received. However, there is no logical reason why the incontestability clause should apply differently to two parties who are covered by the same contract. Furthermore, there is no logical reason why one clause should incorporate relevant state law and public policy, and the other should not. The law will always seek to effectuate a reasonable over an unreasonable interpretation of a contract.

*Brown*, 79 N.M. at 226, 441 P.2d at 755 ("[I]n construing the contract, reasonable rather than unreasonable interpretations are favored by the law.").

Thus, Kathy's death within the contestable period fixed the rights of the parties; the incontestability clause became a nullity even though the contestable period had expired. *See* 18 Couch, *supra*, § 72:47; *Spilker*, 598 A.2d at 933 ("If an insured dies before the policy has been in force two years, the incontestability clause is a nullity and the insurer is not bound by the two year limitation."). The policy could thus be contested by Capitol.

## V. MISREPRESENTATIONS BAR RECOVERY

Since, by the terms of the insurance contract, the incontestability clause became unenforceable upon Kathy's death, Capitol was not bound by that time constraint in contesting the policy. A question in an insurance application propounded for the purpose of determining the existence of a significant bodily disorder allows the insurer to evaluate whether the disorder makes the insured an unacceptable risk. A material misrepresentation in answering such a question will render the policy void. 7 Couch, *supra*, § 37:96 (1985).

A misrepresentation on an insurance application is material if the insurer would not have entered into the contract but for the misrepresentation. By concealing the true nature of her health, Kathy induced Capitol to enter a contract it otherwise would have rejected. *See Modisette v. Foundation Reserve Ins. Co.*, 77 N.M. 661, 667–68, 427 P.2d 21, 26 (1967). Capitol relied upon the misrepresentation and, as a result, was deprived of the opportunity to estimate its risk under the contract. *See Prudential Ins. Co. v. Anaya*, 78 N.M. 101, 105, 428 P.2d 640, 644 (1967).

Capitol bears the burden of proving that the Crows' fraudulent misrepresentations are sufficient to avoid its liability on the contract. *Tsosie v. Foundation Reserve Ins. Co.*, 77 N.M. 671, 675, 427 P.2d 29, 31 (1967).

The insurer can prove misrepresentation in several ways. For example, misrepresentation is indicated when the insurer relies upon statements that were certainly known by the insured to be untrue, or when these statements "are of such a character as clearly to prove a conscious misrepresentation." *See* 7 Couch, *supra*, § 37:106; *Powell v. Time Ins. Co.*, 181 W.Va. 289, 297, 382 S.E.2d 342, 350 (1989). Kathy's claim on the application that she had never been treated for "[c]ancer, cyst, or any tumor disorder of skin or lymph glands," was of such a character.

Also, misrepresentation is suggested by the brevity of time between the applicant's representation about her health and the occurrence of the disease. Though entirely dependent upon the specific facts of each case, this brevity of time can indicate to the company that the insured knew she was afflicted with the disease at the time she applied for insurance. 7 Couch, *supra*, § 37:106; *Metropolitan Life Ins. Co. v. Erdwins*, 229 Mo.App. 437, 83 S.W.2d 597, 604 (1935) ("elapse of only a few months" between application for insurance and commencement of total and permanent disability as evidence of misrepresentation on insurance application). In this case, two days after the issue date of the insurance policy, Kathy was told her cancer had reappeared. This circumstance implies misrepresentation on the part of the Crows.

Evidence of misrepresentation can also be found if the insured does not disclose that she knows she suffers from a serious disease which is statistically likely to shorten her life. *See* 7 Couch, *supra*, § 37:106; *Ford Life Ins. Co. v. Samples*, 277 Ark. 351, 641 S.W.2d 708, 709 (1982) ("There is no question but that 'good health' statement is incorrect as a matter of law when the insured is aware of an affliction which would seriously affect the risk."). Kathy suffered from a form of cancer that Dr. Richter described as "the worst disease we deal with," because it is difficult to detect early and almost impossible to completely eradicate. Kathy's physicians recounted several discussions in which they informed Kathy of the nature of her disease. As a registered nurse she was at least as competent as most people to understand its consequences. There can be little doubt that both she and Edward were aware that ovarian cancer was likely to shorten her life. *See Saunders v. National Old Line Ins. Co.*, 266 Ark. 247, 583 S.W.2d 58, 59–60 (1979) (life insurance policy voided where insured knew he had cancer but claimed to be in good health).

In the Crows' policy, Capitol explicitly noted that "[i]n issuing this policy, we have relied on statements made in the application." Kathy made statements about her health in the application, the statements were incorporated into the policy, and in reliance upon the truth of those statements Capitol issued the policy. Because a jury found that the representations were false and were material to the risk being assumed by the insurance company, the policy was properly voided. *Modisette*, 77 N.M. at 669, 427 P.2d at 27.

## VI. CONCLUSION

For the foregoing reasons we find that Kathy's death rendered the incontestability clause of her life insurance policy unenforceable, and that because of Kathy's misrepresentations about her health on the application form, Capitol properly refused to pay death benefits to Edward, her beneficiary. We therefore affirm the judgment of the trial court.

IT IS SO ORDERED.

FRANCHINI and MINZNER, JJ., concur.